**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-2398-12T2

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

M.C.,

    Defendant-Appellant.

_____

IN THE MATTER OF M.C., M.C., Jr. and
A.C.,

    Minors.

_____

| |
|---|
| **APPROVED FOR PUBLICATION** |
| **May 5, 2014** |
| **APPELLATE DIVISION** |

Argued April 2, 2014 — Decided May 5, 2014

Before Judges Grall, Nugent and Accurso.

On appeal from Superior Court of New Jersey,
Chancery Division, Family Part, Cape May
County, Docket No. FN-05-71-12.

Christine Olexa Saginor, Designated Counsel,
argued the cause for appellant (Joseph E.
Krakora, Public Defender, attorney; Ms.
Saginor, on the brief).

Cynthia Phillips, Deputy Attorney General,
argued the cause for respondent (John J.
Hoffman, Acting Attorney General, attorney;
Lewis A. Scheindlin, Assistant Attorney
General, of counsel; Ms. Phillips, on the
brief).

Janet L. Fayter, Designated Counsel, argued
the cause for minors (Joseph E. Krakora,
Public Defender, Law Guardian, attorney; Ms.
Fayter, on the brief).

The opinion of the court was delivered by

GRALL, P.J.A.D.

M.C. appeals a judgment entered following a fact-finding hearing in an abuse or neglect action that was commenced by the Division[1] pursuant to N.J.S.A. 9:6-8.21 to -8.73 and N.J.S.A. 30:4C-12. The judge determined that M.C.'s fourteen-year-old son Matt,[2] six-year-old son Jack, and four-year-old daughter Jill "were abused and neglected children" as defined in N.J.S.A. 9:6-8.21(c)(4)(b). The Division urges us to affirm, but M.C. contends, and the children's law guardian agrees, that the competent evidence in the record is inadequate to establish abuse or neglect. We agree.

Our decision is informed by New Jersey Department of Children and Families v. A.L., 213 N.J. 1 (2013), a case decided after this judgment was entered. Because there was no evidence

---

[1]   The Division is now known as the Division of Child Protection and Permanency.

[2]   Matt is a fictitious name as are the names used for the other children. M.C. is not Matt's biological father, but at a preliminary hearing on February 22, 2012, M.C. testified that he adopted Matt in 2005. Matt reached the age of fourteen the month after he reported that M.C. was abusing him.

of actual harm, the Division was obligated to present competent evidence adequate to establish that M.C.'s children were presently in imminent danger of being impaired physically, mentally or emotionally.  Id. at 23, 30; see N.J.S.A. 9:6-8.21(c)(4)(b), -8.46(a)(4), (b)(1)-(2).

I

On January 27, 2012, a member of the staff at Matt's school reported Matt's allegation of abuse to the Division. Reportedly, Matt was told that the school would be calling his mother about an argument Matt had with another student in the gym that escalated into a face-to-face encounter and chest-butting.  As reported by the Division's screener who took the call, Matt cried hysterically, "got on his hands and knees," and "begged" school staff not to tell his mother.  Matt said he was afraid to go home, explaining that he "gets hit at home" and that M.C. is the one who hits him — sometimes punching, sometimes smacking and sometimes using a belt.  He said he was last "beaten up after the Christmas break."

The Division caseworker assigned to investigate the referral, Ms. Badger, went to the family home that evening and spoke separately with Matt, Jack, Jill and both of the children's parents.  Matt was the first child Ms. Badger

interviewed. He told her he was taking two medications for bipolar disorder, "ADHD" and anger management.

Matt also advised Ms. Badger that he had not told his mother about his problem at school and did not think the school had told her about it. He said "if he gets into trouble, he is terrified of his dad because he is into physical discipline." Matt said he feels safe when M.C. is not angry but is "very, very scared" when M.C. is angry, which he is "a lot."

Matt said he had bruises in the past, but not presently, explaining that M.C. last hit him about two weeks "before Christmas" because he had gone to wrestling practice instead of homework club after school. When M.C. spoke to Ms. Badger, he acknowledged that he might have "just pushed" Matt and "tapped him [on] his head."

Matt advised Ms. Badger he had not told anyone about the abuse before because he was afraid, and he told her that M.C. slaps him in the face and punches him in the ribs and chest. He claimed that one punch was so hard that it made him cough up blood. The Division never obtained Matt's medical records, and apart from Matt's statements there was no evidence tending to show Matt coughed up blood, had bruises, broken bones or bled.

Jack and Jill told Ms. Badger that Matt gets hit all over

his body.  Jill said that Matt "'gets beated' when he is bad" and that her mom and dad hit her on her butt.

Matt's mother admitted that she knew about M.C.'s use of physical discipline and did not approve.  She said she assumed that when M.C. took Matt to another room to discipline him, he was giving Matt a "spanking," which was something M.C. did no more than twice a year.  Generally, the children were punished by taking electronic devices and other privileges away from them for a time.

Matt told Ms. Badger about a different type of discipline that M.C. meted out once during an event the parties dub "the corner incident."  Without indicating the precipitating event or approximate date, Matt told Ms. Badger that M.C. "pinned him" in a corner, made Jack and Jill come into the room, and directed Matt to slap himself in the face and say "'I'm stupid'" and then slap himself harder and say "'I'm a retard.'"  He said his brother Jack laughed while that was happening.  When Ms. Badger asked M.C. about the corner incident, M.C. said "he only told [Matt] to call himself a liar because he lied" and did not say anything about directing Matt to hit himself.

Ms. Badger asked Jack about the corner incident.  According to Ms. Badger's report, the six-year-old child "affirmed that his dad made [Matt] smack himself and call himself stupid."  He

said that it happened one time and he could not "remember what else his dad made [Matt] sa[y] about himself."  Jack also told Ms. Badger Jill was present.  Ms. Badger did not describe the questions she asked Jack in order to elicit his affirmance of Matt's description of the "corner incident," but she did note that Jack "appeared to laugh and smirk . . . when ask[ed] about [Matt] being hurt."

There was significant and undisputed evidence that M.C. had a problem with drinking.  Matt told Ms. Badger that M.C. drinks alcohol on weekends and hurts people when he does.  He also said that he and his mother and siblings left the house when M.C. was drinking on weekends to stay with family or in a motel.  Matt's mother, and Matt's uncle who lived with the family, confirmed that the mother and children spent some weekends away from home because of M.C.'s drinking.  Matt's mother also told Ms. Badger that M.C. is "not a very nice person" when he drinks and that he is a "binge" drinker, and Matt's uncle acknowledged that his brother gets "talkative and aggressive" when drinking, which he did at home when his family was away.

Matt did not know how much M.C. drank.  He also said he had never seen M.C. stumbling or slurring his words, but he had heard his mom say that M.C. was slurring his words when talking to M.C. on the phone.  Matt reported that his parents fought a

lot about M.C.'s drinking, but he said he had not seen any violence between them.

In speaking with Ms. Badger, M.C. readily acknowledged that he had a drinking problem and said that he was scheduled to commence a program to address it.  He advised Ms. Badger that he enrolled in the program as a consequence of driving while under the influence.

At the conclusion of M.C.'s first interview with Ms. Badger, M.C. told her he was willing to have a substance abuse evaluation and would like to have family counseling.  He also agreed to leave his home.  In fact, he left that night when Ms. Badger departed.

Three days later, Ms. Badger spoke with the staff member from Matt's school who called the Division on January 27.  She said she had not called the child's home that night because Matt said he would not go home and cried hysterically,[3] which was something he had not done when he was in trouble at school before.  Matt asked that no one call his home, because he was afraid his dad would beat him.  The woman told Ms. Badger that she had never seen or heard about Matt having bruises and knew

---

[3]    If the woman told Ms. Badger about Matt getting on his hands and knees, Ms. Badger did not include that information in her summary of the interview.

of no prior complaint he made about physical abuse. She noted that Matt had, however, mentioned that his home was strict.

On February 22, 2012, the Division sought and a judge entered an order placing the children in the care and supervision of the Division. The Division did not seek authorization to remove the children from their home. The order memorialized the parents' consent to cooperate with services offered by the Division, and it restrained M.C. from having contact with the children except when supervised by a person, other than his wife, approved by the Division.

The February 22 order included a provision authorizing the lifting of that restraint with the consent of all counsel. There is no dispute that, with the Division's approval, M.C. resumed residence in his home with his family and without any supervision before the end of April.

In the interim, starting no later than February 27, 2012, M.C. and his family commenced counseling that the Division arranged at Families Matter, LLC. The Division received regular reports on the family's progress. The therapist reported that M.C. was "verbalizing [his] accountability for inappropriate parenting and discipline of his children," "maintaining sobriety," "fully participat[ing] in each session," expressing interest in improving his relationship with Matt and spending

quality time with Matt during the supervised visits he had in the home prior to his return in April. By March, the therapist reported that communications between M.C. and Matt had improved and there were "no safety concerns."

In fact, things improved to the extent that by letter dated March 29, 2012, the therapist advised the second caseworker assigned to M.C.'s family, Ms. McGonagle, that she felt that reunification of the family, meaning having M.C. back in the home, "is appropriate as long as the family continues to participate in weekly family therapy." During a follow-up phone call on April 2, the therapist told Ms. McGonagle that Matt was not "fearful" of M.C.; she noted that Matt was communicating comfortably with, sitting next to and making good eye contact with M.C.

As the therapist suggested, however, M.C. and his family continued counseling and "made significant progress" in their ability to communicate and function as a family. By May 10, 2012, the therapist recommended bi-weekly, rather than weekly visits for the purpose of "observ[ing] family stability." On June 5, the therapist recommended discharging the family because the family had successfully increased communication and improved bonding; the parents had learned new parenting techniques to which the children were responding well; and the family had

discussed M.C.'s alcohol abuse, which M.C. was addressing in a separate program for that purpose. Consequently, on July 3, the family was "successfully discharged."

Despite the successful intervention, the Division proceeded to a fact-finding hearing that commenced on July 27. Testimony was taken that day and on August 13 and 31. Ms. Badger and Ms. McGonagle testified, and the judge fully credited their testimonies. Additionally, in conformity with Rule 5:12-4(b), the judge interviewed Matt in chambers after giving the parties an opportunity to submit questions for the judge to ask Matt, which the Division, but not the law guardian or M.C., did. Before questioning Matt, the judge probed the teenager's understanding of his obligation to tell the truth. The judge also supplemented the Division's questions by following up and posing additional questions raised by Matt's responses. Jack and Jill, however, did not meet with the judge.

During his interview with the judge, Matt denied the truth of the allegations he made on January 27. It was not his first retraction. On January 31, Matt's mother reported that Matt told her he had blown things out of proportion and made some things up. In addition, the therapist from Families Matter reported that Matt said he lied to the school about the events and did not understand the seriousness of that at the time.

The judge did not credit Matt's in camera denials of his initial allegations or his explanation for misreporting M.C.'s conduct. Matt explained that his goal on January 27 was to evoke the sympathy of the school officials so that they would refrain from taking disciplinary action against him; he thought it would lead to his removal from that school, where he was on the football team, and return to the special-needs school he previously attended. Indeed, by the time of the fact-finding hearing, Matt had been returned to the special-needs school.

The judge found Ms. Badger's testimony recounting what Matt told her on January 27 to be more credible than Matt's denial. The judge stressed, however, that he was "not making any finding that [Matt] was influenced or coerced to revise his statements." The judge further found that Matt's prior statements, and those of Jack and Jill, were sufficiently corroborated by M.C.'s admissions and the out-of-court statements made by Matt's mother and uncle to support a finding of abuse and neglect.

On that evidence, the judge concluded that the Division met its burden of establishing, by a preponderance of the evidence, that M.C.'s children were abused and neglected within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). The judge made the following findings of fact supporting his conclusion: 1) both parents used physical discipline that did not amount to

11                                                          A-2398-12T2

"excessive corporal punishment"; 2) there was no evidence of injury; 3) M.C. used "corporal punishment" on Matt and "pinned [Matt] in the corner" and made him "hit/slap himself and call himself 'a liar,'" "'a retard,'" and "'stupid' while his siblings watched"; 4) M.C. "was drinking alcohol to excess"; 5) the mother's removal of herself and the children from the home demonstrated that she "reasonably believed that it was not safe to leave the children home with [M.C.] on those weekends she knew [M.C.] was drinking alcohol to excess"; and 6) Matt "was terrified" of M.C. "when [the school officials] told [Matt] that they were going to report the school incident to his mother" on January 27.

In making those findings, the judge noted that it did not appear that M.C.'s wife "had to leave the home since the Division's involvement with the family beginning on January 27, 2012." He determined, however, that this improved circumstance was irrelevant to his fact finding, presumably concluding that only those circumstances extant on January 27, 2012 were relevant.

The foregoing findings and the judge's reasons and legal conclusions are set forth in a memorandum of decision dated September 14, 2012. They are discussed in the next section of

this opinion along with the controlling legal principles and our reasons for reversal.

## II

As defined in <u>N.J.S.A.</u> 9:6-8.21(c)(4)(b), an "abused or neglected" child includes

> a child whose physical, mental, or emotional condition <u>has been</u> impaired <u>or is</u> in imminent danger of becoming impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, <u>by unreasonably inflicting or allowing to be inflicted harm</u>, or <u>substantial risk</u> [of harm], including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [<u>Ibid.</u> (emphasis added).]

After the judge decided this case, the Supreme Court interpreted the foregoing provision and explained, "In the absence of actual harm, a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." <u>A.L.</u>, <u>supra</u>, 213 <u>N.J.</u> at 23.  And the Court held, "Because the evidence presented did not establish actual harm or imminent danger to [the child], the finding of abuse and neglect against [the parent] under Title 9 cannot be sustained."  <u>Id.</u> at 30.[4]  In

---

[4]    In other passages of the opinion, the proof needed in the absence of harm is described as proof of imminent danger "or"

(continued)

reaching that conclusion, the Court focused on the language of N.J.S.A. 9:6-8.21 defining abuse and neglect and the role this statute plays in the "comprehensive legislative scheme relating to child welfare." Id. at 8.

The language and structure of the provision and the Legislature's stated purpose support a reading of the provision at issue here to require a finding of "imminent danger of" impairment to a child's condition whenever there is no proof of actual harm. N.J.S.A. 9:6-8.21(c)(4) defines what is needed to show that a child is "abused or neglected" with an introductory clause describing the child's condition and the reasons for it — "a child whose physical, mental, or emotional condition <u>has been impaired</u> or <u>is in imminent danger of becoming impaired</u>" as the result of a parent's or a guardian's "failure . . . to exercise a minimum degree of care." N.J.S.A. 9:6-8.21(c)(4) (emphasis added). That introductory clause is followed by two clauses, (a) and (b), that serve to identify the parental failures that

_____

(continued)
substantial risk of harm. See, e.g., id. at 8, 23. In light of the Court's holding, we assign no significance to the use of different conjunctions in the discussion. Because the Court found that neither standard was met, id. at 27-28, the question of need for proof of both was not raised. If the Court had determined that a finding of a substantial risk without extant imminent danger of a child's condition becoming impaired would suffice, it most likely would have stated that the evidence was inadequate to establish actual harm, imminent danger to the child, or a substantial risk of harm. Cf. id. at 30.

can be considered in assessing whether the child's condition has been impaired or is in imminent danger of becoming impaired. Ibid. Subparagraph (a), not implicated in this case, identifies failures in supplying a child's basic needs; (b) identifies failures related to parental supervision and discipline — those that have either caused harm or created a substantial risk of harm.

Setting aside cases where actual impairment of the child's condition is proven, the structure and language indicates that a parent's creation of a substantial risk of harm in the past may support a finding of abuse or neglect. But that is so only where the essential criteria set forth in the introductory clause are met. That is, there must be evidence establishing that lax supervision or improper discipline amounted to a failure to "exercise a minimum degree of care" in either endeavor, and there must be evidence the child's condition, while not yet impaired, "is in imminent danger of becoming impaired." N.J.S.A. 9:6-8.21(c)(4).

The question is the effect of the parental conduct. For example, use of an illegal substance, without more, will not establish abuse or neglect. See A.L., supra, 213 N.J. at 24 (discussing with approval N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 331-32 (App. Div. 2011), a case in

which this court reversed a finding of abuse and neglect based on drug screens done at the time of the father's supervised visitation that showed his drug use, on the ground that the Division presented no evidence establishing he posed a risk to the child during those visits). Similarly, evidence of less than admirable parental conduct is inadequate to establish abuse or neglect in the absence of evidence establishing that the child's "'physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired because'" of a parent. N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 39 (2011).

Where a finding of abuse or neglect rests only on imminent danger of impairment of the child's physical, mental or emotional condition, the question is whether the child "is in imminent danger of becoming impaired." N.J.S.A. 9:6-8.21(c)(4) (emphasis added). This statutory language plainly requires an evaluation of the present danger. Thus, prior parental conduct posing a risk of harm in the past that did not materialize is pertinent to imminent danger only to the extent that it is probative of current danger. See N.J. Div. of Youth & Family Servs. v. I.H.C., 415 N.J. Super. 551, 575-77 (App. Div. 2010).

A determination of abuse or neglect requires consideration of the totality of the circumstances and their synergistic

relationship. P.W.R., supra, 205 N.J. at 39. Thus, in determining whether a child "is in imminent danger," risk demonstrated by past conduct should be assessed in light of actions since taken to address prior dangerous parenting — for example, parental action that has eliminated a previously existing danger of impairment before the risk materialized.

In our view, the Legislature's decision to require proof that a child "is in imminent danger" requires an assessment of the evidence available at the time, which may be different when the complaint is filed than it is at the time of the fact-finding hearing. P.W.R. provides some support for that conclusion beyond its direction to consider the totality of the circumstances. The Court, discussing its prior decision in New Jersey Division of Youth & Family Services v. K.M., 136 N.J. 546, 550 (1994), a case involving parental failure to provide for their children's basic needs, noted: "Importantly, despite DYFS assistance, and intensive parenting-skills programs provided to help the parents, neglect was found when the home conditions did not improve." P.W.R., supra, 205 N.J. at 34. Just as parental inaction in addressing past conditions posing a danger to a child is a circumstance pertinent to a finding of abuse or neglect based on the child being in "imminent danger," parental action eliminating a danger is also pertinent. To the

extent the judge concluded that improvement of M.C.'s conduct and conditions in the home was irrelevant to that issue in this fact-finding hearing, the judge erred.  See N.J. Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 512-13 (App. Div. 2010) (considering improvement of conditions and attitudes contributing to an isolated incident of abuse and the Division's determination that its services were no longer required), appeal dismissed as improvidently granted, 208 N.J. 355 (2011).

The foregoing understanding of the need to focus on present circumstances in considering whether the child is in imminent danger of being impaired is consistent with the "purpose animating Title Nine[, which] 'is to provide for the protection of children under 18 years of age who have had serious injury inflicted upon them.'"  P.W.R., supra, 205 N.J. at 31 (quoting N.J.S.A. 9:6-8.8).  The concern is "not the culpability of parental conduct," G.S. v. Dep't of Human Servs., 157 N.J. 161, 177 (1999), or whether the parental conduct is worthy of emulation or award, P.W.R., supra, 205 N.J. at 39.

A finding that a child "is in imminent danger of becoming impaired" where, by all accounts, the dangerous condition has been remediated to the point that the family has been safely reunified and can remain safely together without additional supervision or therapeutic services, is difficult to square with

the language of N.J.S.A. 9:6-8.21(c)(4). As previously noted, it applies if the child "is in imminent danger of becoming impaired . . . ." Ibid. (emphasis added). Without evidence permitting a finding of likely repetition of past conduct creating a substantial risk of harm, a finding based on past conduct cannot be sustained. The statute permits a focus on past conduct alone only when the child's condition "has been impaired."

With those standards in sight, we consider the judge's reasons for concluding that the Division met its burden of proving actionable abuse or neglect. Where the evidence is inadequate to "satisfy the standard articulated in N.J.S.A. 9:6-8.21(c)(4)," reversal is required. P.W.R., supra, 205 N.J. at 21, 39-40; see also A.L., supra, 213 N.J. at 29-30.

The judge provided the following statement of his reasons for concluding that the Division met its burden.

> The court looks to the past conduct of [M.C.] in determining risk of harm to the children. Additionally, the court may also examine the parents' behavior to determine whether it creates an imminent risk of harm. This court has done so. As noted above, the court found that [Matt] was terrified of his father. The basis of [Matt's] fear became readily apparent following Ms. Badger's interviews in the home.
>
> This court finds that when a parent subjects a child to the combination of corporal punishment (which is not

19                                          A-2398-12T2

excessive), self-injurious punishment while calling himself degrading names while his siblings watch and laugh, and is also required to leave their home every weekend due to excessive drinking of alcohol, said parent creates a substantial risk of harm to the physical, mental or emotional condition of a minor child. Moreover, the court finds that a parent that engages in such conduct failed to exercise a minimum degree of care in that the conduct is grossly negligent, and the children are in a substantial risk of harm.

The fact that the children were not physically injured at the time of the interviews is of no moment for this court's consideration. The disciplinary measures employed by [M.C.] were severe in the sense that [Matt] was terrified of his dad and he got down on his hands and knees to beg that his parents not be told of the incident at school. It was clear to this court that [Matt] was mentally or physically strained to the point that his health or physical or moral well-being may be injured.

Moreover, [Matt's mother's] act of removing herself and the children from the home when [M.C.] drank excessive amounts of alcohol reinforces to this court that [Matt] and his siblings are abused and neglected children. [Matt's mother] found it in the children's best interest to take refuge out of the home to protect the health, safety and welfare of the minor children from [M.C.]. [Matt's mother's] action of leaving the home as often as she described with the children speaks volumes that the children's physical, mental or emotional condition was in imminent danger of becoming impaired as a result of [M.C.'s] failure in exercising a minimum degree of care and that the children were in a substantial risk of harm. Indeed, it was not a secret to the children why they left the home on weekends.

20

In applying the law to the facts, the judge did not find that Matt's or his sibling's condition had been impaired. He found a risk of harm and imminent danger of impairment, but the judge looked only to "past conduct" in determining risk of harm to the children. Setting aside the thin support in the record for the conclusions that "the children's physical, mental or emotional condition <u>was</u> in imminent danger of becoming impaired" and that they "were in a substantial risk of harm,"[5] when their mother removed them on the weekends, the law requires a determination of extant imminent danger. It is not enough to say that the children were in imminent danger of becoming impaired in the past.

The record does not support a finding that the past conduct the judge found to have created a substantial risk of harm was likely to be repeated. The "corner incident" was a one-time

---

[5] The children's law guardian and M.C. persuasively argue that M.C.'s drinking away from home and the weekend removals of the children when he drank at home demonstrate paternal efforts to shield the children from any risk of harm or impairment presented by exposure to such conduct.

It is worth noting that Matt's vague account of M.C.'s drinking and M.C.'s admissions provide the only competent evidence about M.C.'s drinking prior to the Division's intervention. The statements made by Matt's mother and uncle were not admissible for the truth of the matters they asserted as Ms. Badger reported. Neither testified and neither spoke to Ms. Badger with M.C.'s authorization or as his agent, and their statements were admitted against M.C., not them. <u>N.J.R.E.</u> 803(a), 803(b).

occurrence, and the judge found that the corporal punishment was not excessive. As the judge noted, since the Division intervened, M.C.'s drinking had not caused the mother to remove the children. Despite Matt's professed fear of M.C. that Matt explained was connected with his being in trouble at school, the teenager came home from school on the day he got in trouble. Moreover, the family's therapist at Families Matter reported that things quickly changed.[6] M.C. had recognized and modified his inappropriate parenting and disciplining techniques, maintained sobriety, and improved his relationship with Matt. Importantly, the therapist reported that Matt was not "fearful" of M.C. and was communicating comfortably with, sitting next to and making good eye contact with M.C.

In short, this case was one of the Division's success stories. On the record of the fact-finding hearing, there is no evidence supporting a finding that any one of M.C.'s children "is in imminent danger of becoming impaired" as a consequence of M.C.'s prior drinking or inappropriate discipline.

---

[6] The therapist's periodic reports to the Division are admissible. The Division "is permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants. Pursuant to Court Rule, '[c]onclusions drawn from the facts stated therein shall be treated as prima facie evidence, subject to rebuttal.' R. 5:12-4(d)." P.W.R., supra, 205 N.J. at 32.

Considering the totality of the circumstances and their synergistic relationship, the evidence was inadequate to prove the present imminent danger that is essential to a finding of abuse or neglect as defined in N.J.S.A. 9:6-8.21(c)(4)(b) when there is no finding of actual harm or impairment. Accordingly, this finding of abuse and neglect must be reversed and vacated.

Because the inadequacy of the evidence requires reversal, it is not necessary to address M.C.'s objections to insufficiency of the evidence corroborating the children's out-of-court statements. Pursuant to N.J.S.A. 9:6-8.46(a)(4), "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect."

The question whether overlapping out-of-court statements of children can, without more, satisfy the statutory corroboration requirement frequently arises and has not been addressed in a published opinion. In our view, it is reasonable to assume that the Legislature intends courts to apply this statutory corroboration requirement in the same manner as courts consider the adequacy of evidence corroborating a confession. See N.J.S.A. 1:1-1 (directing that "words and phrases" appearing in statutes "having a special or accepted meaning in the law, shall

be construed in accordance with such . . . special and accepted meaning").

In the context of confessions, the trial court must determine "whether there is any legal evidence, apart from the confession of facts and circumstances, from which the jury might draw an inference that the confession is trustworthy." State v. Lucas, 30 N.J. 37, 62 (1959); accord State v. Reddish, 181 N.J. 553, 618 (2004). Legal evidence is generally understood to exclude hearsay that is inadmissible under the Rules of Evidence. See Swain v. Neeld, 49 N.J. Super. 523, 528 (App. Div.), rev'd on other grounds, 28 N.J. 60 (1958).

But the admissibility of extrajudicial statements of children pursuant to N.J.S.A. 9:6-8.46(a)(4) does not depend on admissibility under the evidence rules. For that reason, we do not think that overlapping out-of-court statements of children that are not otherwise admissible hearsay have any tendency to show the trustworthiness of each other. Of course, if all of the children who made the overlapping statements testified in court or in camera, the analysis would be different. See generally R. 5:12-4(b) (discussing in camera proceedings); N.J. Div. of Youth & Family Servs. v. H.B., 375 N.J. Super. 148 (App. Div. 2005) (discussing the need for children's testimony in the

circumstances of that case); <u>N.J. Div. of Youth & Family Servs. v. L.A.</u>, 357 <u>N.J. Super.</u> 155 (App. Div. 2003) (same).

For several reasons, this case is a poor vehicle for a definitive resolution of that question. First, as discussed above, this appeal can be decided without reaching the issue. We have reversed on inadequacy of the evidence and considered all of the evidence admitted in reaching that conclusion.

Second, M.C.'s admissions, which corroborated the children's statements, were admissible against him as a party in the abuse or neglect action, <u>N.J.R.E.</u> 803(b)(1). His admissions, without more, provided adequate corroboration under our prior decisions. "By its nature, corroborative evidence 'need only provide support for the out-of-court statements.'" <u>L.A.</u>, <u>supra</u>, 357 <u>N.J. Super.</u> at 166 (quoting <u>N.J. Div. of Youth & Family Servs. v. Z.P.R.</u>, 351 <u>N.J. Super.</u> 427, 436 (App. Div. 2002)). M.C. acknowledged his drinking problem, his wife's removal of the children from their home when he drank, his use of physical discipline — pushing Matt and tapping him on the head — and his punishing Matt by having Matt call himself a liar. We cannot conclude that the judge abused his discretion in finding that Matt's statements were sufficiently corroborated by those admissions.

Third, because Matt testified <u>in</u> <u>camera</u>, any statements he made when speaking with Ms. Badger that qualified as inconsistent with his <u>in</u> <u>camera</u> testimony, if offered in conformity with <u>N.J.R.E.</u> 613, were admissible pursuant to <u>N.J.R.E.</u> 803(a)(1). <u>See</u> <u>State in the Interest of R.V.</u>, 280 <u>N.J. Super.</u> 118, 120-21 (App. Div. 1995).

Fourth, the issue was merely suggested, not argued with supporting authority, in the briefs submitted on appeal.

Reversed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2398-12T2