# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3513-15T1

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.H.,

    Defendant-Appellant,

and

C.G.,

    Defendant.

_____

IN THE MATTER OF E.G. and M.G.,

    Minors.

_____

        Submitted January 8, 2018 — Decided June 7, 2018

        Before Judges Accurso and Vernoia.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Essex County,
        Docket No. FN-07-0408-15.

        Joseph E. Krakora, Public Defender, attorney
        for appellant (Anthony Van Zwaren, Designated
        Counsel, on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Andrea M. Silkowitz, Assistant Attorney General, of counsel; Lisa J. Rusciano, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.H.[1] appeals from a Family Part order finding she abused or neglected her daughter, Mary, by failing to obtain well-child checkups and immunizations, and delaying seeking medical attention for Mary's broken arm. Because we find there was insufficient evidence showing Mary suffered actual harm or was at imminent risk of harm, we reverse.

I.

On March 20, 2015, the New Jersey Division of Child Protection and Permanency filed a notice of emergency removal of six-year-old Emma and one-and-one-half-year-old Mary from their parents, defendant and co-defendant C.G., in accordance with the Dodd act.[2]

---

[1] We employ initials and first-name pseudonyms to protect the privacy of the parties, children and juvenile witness.

[2] A "Dodd removal" is the emergency removal of a child without a court order, pursuant to N.J.S.A. 9:6-8:29 of the Dodd Act, codified in N.J.S.A. 9:6-8:21 to -8:82. N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

A-3513-15T1

Four days later, the Division filed a complaint and order to show cause for custody of the children, and the court entered an order granting the requested relief.

The evidence during the subsequent fact-finding hearing showed Division investigator Tamika S. Dickey first became involved with defendant, Emma and Mary in January 2015, based on a referral Emma was not attending school.[3]  On February 17, 2015, Dickey interviewed defendant and C.G.,[4] and determined Mary had not been seen by a doctor since birth.  C.G. explained he did not believe in immunizations for religious reasons, but could not identify his religion when asked to do so.  Defendant had no objection to Mary receiving immunizations, and said Emma's immunizations were up-to-date.

Defendant told Dickey she had not taken Mary to the doctor because the child's name and date of birth on her Medicaid card

[3]  On October 16, 2013, the Division first became involved with C.G. when a Family Part judge ordered home assessments for C.G.'s son with another woman.

[4]  The Family Part judge found C.G. abused or neglected Mary and Emma by placing the children at substantial risk of harm by exposing them to a pattern of domestic violence.  C.G. does not appeal the court's finding, and it is therefore unnecessary to address the evidence concerning his domestic violence history. The finding of abuse or neglect as to defendant was based solely on her alleged medical neglect of Mary.  Thus, we limit our discussion of the relevant evidence to defendant's alleged neglect of Mary's medical needs.

were incorrect. Dickey advised Mary to contact the social services office to correct the card. Defendant signed a family agreement stating she would take the children to a doctor within two weeks for physical examinations and any necessary immunizations. C.G. refused to sign the agreement.

In early March 2015, defendant told Dickey she had been unable to take the children to the doctor because she was required to take Emma to school by 8:00 a.m., and could not make it to the clinic to get Mary examined. Dickey again directed defendant to take the children to the doctor, and instructed defendant to take Mary to the doctor after taking Emma to school. Dickey subsequently learned defendant and C.G. had a physical altercation on March 14, 2015, which prompted defendant to move into a domestic violence shelter.

Dickey and defendant agreed to meet at Emma's school on March 20, 2015, to pick the child up and go together to the domestic violence shelter to discuss a case plan. Upon arriving at the school, Dickey learned defendant is often late in picking Emma up, and that a domestic violence incident between defendant and C.G. occurred outside of the school earlier that morning.

Dickey called defendant, who said she was at Newark Beth Israel Hospital with Mary for the physical examination Dickey had directed. Defendant explained she took Mary to the hospital

because she missed an appointment earlier that day with a doctor. Believing defendant's statement she was at the hospital only for Mary's physical examination, Dickey told defendant to leave the hospital to pick Emma up at school.[5] Defendant left the hospital with Mary and went to Emma's school where Dickey waited.

Dickey received a phone call from the hospital's domestic screening department advising that Mary had a possible fracture of her right arm and defendant left the hospital without following its recommendation that Mary's arm be X-rayed. It was then that Dickey first learned Mary had suffered an injury to her right arm.

After defendant and Mary arrived at Emma's school, Dickey took defendant and the children back to the hospital. X-rays showed Mary had two broken bones in her right arm above her wrist. The evidence presented at the hearing did not describe in detail the nature or extent of the fractures. Mary's arm was put in a cast and defendant was directed to follow-up with an orthopedist within two weeks.

At the hospital, defendant offered two versions of how Mary was injured. She first told Dickey that Mary fell on her arm at approximately midnight on March 14, 2015, while playing in the

---

[5] Although Dickey was at the school at the time, she could not pick up Emma at school because the Division did not have an order granting it the care and custody of the child.

living room. She also offered another version of the events, stating Mary hurt her arm after defendant's twelve-year-old nephew Ian dropped Mary while they played in the kitchen.

Defendant also provided Dickey with conflicting explanations for her delay in seeking medical attention. She first told Dickey that although she noticed on March 15 that Mary was not bearing any weight on her right arm, a doctor previously told her "children's bones are flexible and they heal fast." She also stated she was unable to take Mary to the doctor because she did not have a babysitter for Emma. She did not explain why she did not take Mary to the doctor while Emma was in school on the days following the incident.

Defendant's nephew Ian testified about how Mary was injured on March 14, 2015. He said he put Mary on a chair in the kitchen and she fell when he looked away for a moment. A few days later, he noticed Mary was not using her right arm to crawl, so he told his mother what had happened and she immediately informed defendant.

Defendant testified she did not witness Mary's March 14, 2015 fall, but the following day noticed the child was not bearing any weight on her right arm. She said Mary did not cry or show any discomfort, and she did not see any redness or swelling on Mary's arm.

6                                              A-3513-15T1

Defendant testified she first learned about Mary's fall on March 18, when Ian's mother called and told her what happened. Defendant explained that on March 19, she dropped Emma off at school and asked the school nurse to look at Mary's arm. Defendant said she took Mary later that day to a pediatrician who refused to provide any services because of the problems with Mary's Medicaid card.

Defendant further testified she scheduled an appointment with another doctor for the morning of March 20, but could not find the doctor's office, so she took Mary to Newark Beth Israel Hospital that afternoon. Defendant told a doctor at the hospital that Mary needed her shots and had hurt her arm. Defendant testified that when she spoke to Dickey on the phone she did not say Mary's arm was fractured or broken because that diagnosis had not yet been made. She also feared that if she did not follow Dickey's directive and leave to pick up Emma from school, the Division would take her children away. Defendant admitted lying when Dickey first asked what happened to Mary. She testified she lied because she "knew they were [going to] find a reason to take [her] children."

The Family Part judge found defendant was not a credible witness because she told Dickey conflicting versions about what occurred. He determined defendant knew about Mary's injury by

7

March 15, 2015, when she observed Mary could not bear any weight on her right arm. The judge found that defendant had never previously brought the child to a pediatrician, and delayed seeking medical care for Mary's arm. The judge did not make any findings that defendant's delay in seeking medical care caused actual harm or created an imminent danger or significant risk of harm. The judge concluded defendant abused or neglected Mary based on medical neglect by failing to take the child for well-child visits and immunizations during the first one-and-one-half years of her life, and by delaying seeking treatment for Mary's fractured arm.[6]

Defendant appealed, and offers the following arguments for our consideration:

POINT I

THE LOWER COURT ERRED IN FINDING ABUSE OR NEGLECT BECAUSE THERE WAS NO EVIDENCE THAT THE MOTHER'S ACTIONS HARMED THE CHILDREN OR PLACED THEM IN IMMINENT DANGER — SHE DID NOT KNOWINGLY CAUSE AN UNREASONABLE DELAY IN HER

_____

[6] Although the Law Guardian argues to the contrary, we agree with the Division that it did not allege, and the judge did not find, defendant abused or neglected Mary or Emma by exposing them to domestic violence. See, e.g., N.J. Div. of Child Prot. & Permanency v. I.H.C., 415 N.J. Super. 551, 582-84 (App. Div. 2010) (explaining that evidence showing parents exposed their children to domestic violence in a grossly or wantonly negligent manner supports a finding of abuse or neglect where there is also competent evidence showing the children suffered harm from the exposure). Instead, the court found C.G. abused or neglected Emma and Mary based on his domestic violence history. Again, C.G. has not appealed the court's finding, and we therefore neither address it nor the fact-findings upon which it is based.

DAUGHTER'S TREATMENT, AND THE DELAY DID NOT IMPACT HER RECOVERY[.]

POINT II

THE TRIAL JUDGE ERRED IN CONCLUDING THAT THE MOTHER ABUSED OR NEGLECTED THE CHILDREN BASED ON ACTS OF DOMESTIC VIOLENCE INFLICTED BY THE FATHER UPON HER[.]

II.

Our review of a trial court's findings of fact is limited and "findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Inv'rs Ins. Co., 65 N.J. 474, 484 (1974)). Family courts in particular have "broad discretion because of [their] specialized knowledge and experience in matters involving parental relationships and the best interests of children." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 427 (2012). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts [is] not entitled to any special deference." Manalapan Realty, LP v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

N.J.S.A. 9:6-8.21(c)(4)(b) defines a child as abused or neglected where the child's

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure

> of his parent or guardian . . . to exercise a
> minimum degree of care . . . in providing the
> child with proper supervision or guardianship,
> by unreasonably inflicting or allowing to be
> inflicted harm, or substantial risk thereof[.]

The failure to exercise a "'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." Dep't of Children & Families v. E.D.-O., 223 N.J. 166, 179 (2015) (quoting G.S. v Dep't of Human Servs., 157 N.J. 161, 178 (1999)).

Whether conduct is merely negligent, as opposed to grossly or wantonly negligent, is determined by a fact-sensitive inquiry where the conduct is "evaluated in context based on the risks posed by the situation." Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011). A parent or guardian "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." E.D.-O., 223 N.J. at 179 (quoting G.S., 157 N.J. at 181).

A finding of abuse or neglect under N.J.S.A. 9:6-8.21(c)(4) "can be based on proof of imminent danger and a substantial risk of harm." Id. at 178 (quoting N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 22 (2013)). Actual harm need not be shown,

only the substantial risk thereof, by virtue of the caregiver's failure to exercise a minimum degree of care. Ibid.

Defendant argues the court erred by finding Mary was abused or neglected under N.J.S.A. 9:6-8.21(c)(4) based on medical neglect. She claims she was not grossly or wantonly negligent in obtaining medical treatment for Mary's arm injury because she was not immediately aware of the injury when it occurred, she first learned of the cause of the injury on March 18, 2015, and she tried obtaining medical treatment on March 19, but the doctor did not accept Mary's Medicaid coverage. She argues she then promptly took Mary to the hospital on March 20. In addition, she contends there was no evidence Mary suffered actual harm or a substantial risk of harm by the delay in obtaining medical treatment for Mary's broken arm or by her failure to obtain well-child examinations and immunizations for Mary prior to March 20, 2015.

Defendant's argument concerning her delay in seeking treatment for Mary's arm injury is founded on a version of the facts the court found not credible. The judge rejected defendant's testimony and determined she was aware of Mary's injury on March 15, 2015, when she observed that Mary could not place any weight on her right arm. Mary had not yet learned to walk in March 2015, and thus relied on her arms and legs to crawl. Defendant admitted that on March 15, 2015, she observed that Mary could not place any

weight on her right arm, but she took no action to examine the child, investigate the problem or seek medical attention until March 20. We defer to the trial court's credibility determination, see State v. Kuropchak, 221 N.J. 368, 382 (2015), and are satisfied the credible evidence supports the court's determination defendant delayed seeking medical treatment for Mary's arm injury until immediately before she was to meet with Dickey who, for a month, had been directing that Mary and Emma be taken for physical examinations.

The court's determination that defendant delayed seeking medical treatment for Mary's arm injury does not end the inquiry. "Each determination of whether the conduct of a parent or caretaker constitutes child abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(b) requires a determination of whether the child suffered actual physical, mental, or emotional harm or whether the conduct exposed the child to an imminent risk of such harm." E.D.-O., 223 N.J. at 185. The statute does not require that a child experience actual harm. Id. at 178. (citing A.L., 213 N.J. at 23). Instead, a court may find a child has been abused and neglected if his or her physical, mental, or emotional condition has been "impaired or is in imminent danger of becoming impaired." N.J.S.A. 9:6-8.21(c)(4).

"Judges at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm. Instead, the fact-sensitive nature of abuse and neglect cases turns on particularized evidence." A.L., 213 N.J. at 28 (internal citation omitted). In A.L., the evidence showed the defendant mother used cocaine during her pregnancy and the child had cocaine metabolites in his meconium. Id. at 27. The Court, however, reversed the finding of abuse or neglect based on the mother's prenatal drug use. Id. at 34. The Court determined that although the evidence established the defendant used cocaine during her pregnancy, the Division failed to "establish proof of imminent danger or substantial risk of harm" because it failed to present evidence showing "the degree of future harm posed to the child." Id. at 27-28. The Court noted that where "the evidence presented does not demonstrate actual or imminent harm, expert testimony may be helpful." Id. at 28.

Similarly, in New Jersey Division of Youth & Family Services v. S.I., 437 N.J. Super. 142, 146 (App. Div. 2014), we considered a trial court determination that the failure of a guardian to follow a Division recommendation to obtain a mental health evaluation following a child's threat to commit suicide constituted abuse or neglect. We reversed the finding because the Division failed to present any evidence "demonstrat[ing] the

A-3513-15T1

child's physical, mental, or emotional condition was impaired or that she was in imminent danger of harming herself as a result of [the defendant's] decision to decline the recommendation for an immediate evaluation." Id. at 157.

We further noted the "need for evidence to support a claim of abuse or neglect," including "proof of actual harm or, in the absence of actual harm, 'the Division was obligated to present competent evidence adequate to establish [the child was] presently in imminent danger of being impaired physically, mentally or emotionally.'" Id. at 158 (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. M.C., 435 N.J. Super. 405, 409 (App. Div. 2014)). The Division's "essential proofs cannot merely be based on the Division's view that the parent or guardian's decision was ill-advised." Ibid. The Division must establish the child suffered actual "harm or show the likelihood of an imminent substantial risk of harm rising above mere negligence." Ibid.

Measured against these standards, we are convinced the court erred by finding the Division satisfied its burden. The record is bereft of any evidence showing defendant's ill-advised delay in seeking medical attention caused Mary actual harm or that there was a likelihood of imminent risk of harm due to the delay. The Division failed to introduce any evidence showing the nature and extent of the fracture and, more importantly, whether defendant's

delay in obtaining medical attention resulted in any actual harm or created an imminent risk of substantial harm.

The court did not find that actual harm or an imminent risk of harm resulted from the delay in seeking medical treatment, the record is devoid of any evidence supporting such a finding, and we cannot bridge the gaps in the Division's proofs and assume harm where the Division opted not to present any evidence demonstrating harm. A.L., 213 N.J. at 28. Lacking any evidence showing actual harm or an imminent risk of harm, we reverse the court's determination that defendant abused or neglected Mary by not seeking treatment for the child's arm injury prior to March 20, 2015.

For the same reason, we reverse the court's determination defendant abused or neglected Mary by failing to take her for well-child examinations or immunizations prior to March 20, 2015. Again, although we agree that well-child visits and immunizations are important to a child's health and well-being, the Division failed to present any evidence showing defendant's failure caused actual harm or an imminent risk of harm to Mary.

Reversed.[7]

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[7]  Because we reverse the court's abuse or neglect finding based on medical neglect, and agree the Court did not find defendant abused or neglected the children by exposing them to C.G.'s domestic violence, it is unnecessary that we consider defendant's contention, raised for the first time in her reply brief, that the court erred by relying on Dr. Johnson's testimony concerning the risks posed to the children by C.G.'s domestic violence.  We observe, however, that an issue not raised in a party's initial merits brief is deemed to be waived on appeal, Drinker Biddle & Reath LLP v. N.J. Dept. of Law & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011), and we generally decline to address arguments that were not "properly presented to the trial court" and do not "go to the jurisdiction of the trial court or concern matters of great public interest," State v. Robinson, 200 N.J. 1, 20 (2009) (quoting Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973)).

A-3513-15T1