# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-4903-17T3
              A-4904-17T3

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

S.A. and F.W.C.,

      Defendants-Appellants.

_____

IN THE MATTER OF F.E.C.
and D.J.C.,

      Minors.

_____

Argued June 5, 2019 – Decided June 18, 2019

Before Judges Alvarez and Mawla.

On appeal from Superior Court of New Jersey, Chancery Division, Family Part, Sussex County, Docket No. FN-19-0070-17.

Beth Anne Hahn, Designated Counsel, argued the cause for appellant S.A. (Joseph E. Krakora, Public Defender,

attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Beth Anne Hahn, on the briefs).

Adrienne Marie Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant F.W.C. (Joseph E. Krakora, Public Defender, attorney; Adrienne Marie Kalosieh, on the briefs).

Victoria Almeida Galinski, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jason Wade Rockwell, Assistant Attorney General, of counsel; Julie Beth Colonna, Deputy Attorney General, on the brief).

Sara A. Friedman, Designated Counsel, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Sara A. Friedman, on the brief).

PER CURIAM

In these back-to-back appeals, which we have consolidated for purposes of this opinion, S.A. (Stella[1]) and F.W.C. (Floyd), challenge a May 18, 2018 order entered following a fact finding hearing concluding they committed abuse or neglect of their children F.E.C. (Flynn) and D.J.C. (Dylan). We affirm.

We take the following facts from the record of the fact finding hearing. The underlying incident occurred on the evening of May 17, 2017. At the time, Flynn and Dylan were less than eight and two years of age, respectively.

---

[1] We use fictitious names to protect the privacy of the children. R. 1:38-3(d)(12).

The parties have had a history with the Division of Child Protection and Permanency (Division). According to the testimony of Division caseworker Jasmin Gould, beginning in 2000, the Division received fourteen referrals related to Stella's substance abuse, which resulted in the removal of her five older children. Stella was substantiated for child neglect on seven occasions and Floyd has been substantiated twice.

In November 2016, Stella was admitted to the hospital after she suffered a seizure, which was determined to be the result of ingesting illicit drugs. As a result, the Division implemented a safety protection plan, which required Floyd to supervise Stella's parenting time with Flynn and Dylan. Between November 2016 and May 2017, the Division's records reflected Stella refused to submit to drug testing on multiple occasions. However, because Floyd was cooperative and demonstrated an ability to care for and maintain a home for the children, the Division had no concerns for the children's safety.

At approximately 10:00 p.m. on May 17, 2017, New Jersey State Trooper Shamik Songui responded with a fellow officer to the parties' residence regarding a domestic violence complaint. When they arrived, Songui observed a man inside the home, wearing a black t-shirt with a red graphic on it, look at him from a window and then walk away. The troopers knocked on the front

3

door, but no one answered and it was locked. Approximately ten to fifteen minutes later, a man approached in a hooded sweatshirt. Songui stopped the man and asked him to lift his sweatshirt. The man, later identified as Floyd, was wearing the same shirt underneath as the man Songui had earlier observed at the window. Floyd denied he was in the house earlier, but admitted it was his house and permitted the troopers to enter through an unlocked back door. When the troopers told Floyd they were responding to a domestic violence complaint, he stated there was "nobody" in the home.

Once inside the residence, Songui testified there was a bloody towel in the kitchen and blood spots all over the floor throughout the residence. Troopers heard noises coming from the hall and discovered Dylan crying alone in a crib. The child was found in a dark room with an inoperable light switch and had a bottle containing spoiled milk. Flynn was visiting with his paternal grandmother at the time.

While Songui was speaking with Floyd, he noticed his pupils were constricted and his answers to questions were incoherent. Songui observed drug paraphernalia, including a pipe, plastic baggies, copper wire, and empty wax folds, strewn around the master bedroom, which Songui believed was evidence of heroin use. When Songui questioned Floyd about a broken window and blood

4

spots on the floor in the bedroom, he explained Stella had kicked the window during an earlier fight. Songui discovered three hypodermic needles in plain view inside Flynn's bedroom. The troopers arrested Floyd for drug possession, child endangerment, and assault.

At this time, Stella entered the residence. Songui observed she had a cut and dried blood on her face, and smelled of alcohol. She informed Songui she had been drinking, Floyd struck her, and the blood throughout the house was hers.[2] She stated she was in the wooded area behind the home when police arrived. Songui deduced the parties fled the house as soon as they saw police arrive. Stella was also arrested for obstructing an investigation and endangering the welfare of a child.

A Division Special Response Unit (SPRU) caseworker responded to the State Police barracks to interview the parties. Stella told the worker Floyd had head butted her after they got into an argument about their pending eviction. She then hid from him in the woods behind their home. Although she denied being drunk or using drugs, the caseworker noted Stella still smelled of alcohol several hours after the incident. When the SPRU caseworker attempted to

---

[2] In addition to the kitchen and master bedroom, there was blood on the hallway floor, on the bathroom door, and in the bathroom.

A-4903-17T3

interview Floyd and question him about the alleged drug use, he responded "well I'm being charged with it. So it must be." He then began to cry because he claimed he was "going to lose [his] kids anyway."

The following day, Division caseworker Jasmin Gould interviewed Floyd in the barracks. He confirmed he and Stella had been in a physical altercation over their pending eviction and that he was under the influence of heroin at the time. When Gould inquired about the scratches on his body, he claimed Stella attacked him with a knife. He would not comment about leaving Dylan alone in the home.

The same day Gould interviewed Stella, who had been released from custody and returned to the parties' residence. Gould observed Stella's eyes were "pinpoint" and that she had bruises and lacerations on her face. Stella also had track marks on her arm consistent with drug use.

Stella repeated her earlier account of the physical violence the night before and her escape into the woods. She added that Floyd attempted to choke her and she scratched his face in self-defense. Stella also stated she left Dylan in the residence because she feared for her life and did not want to violate the safety protection plan.

A-4903-17T3

The trial judge set forth his decision in a forty-three page oral opinion. The judge found Gould and Songui testified credibly. There were no other witnesses at trial. The judge stated "this case is about a continuum of events that placed [the children] at a substantial risk of imminent harm[.]" He found Stella and Floyd's drug and alcohol abuse, respectively, had created the conditions leading to the events the night of the incident and posed a risk of harm to the children. He concluded:

> It is the totality of the circumstances in this case that convinces the [c]ourt [Stella] committed an act of child abuse [or] neglect. She engaged in a violent confrontation with [Floyd.] She was intoxicated through the use of alcohol and was still demonstrating signs of that alcohol use three hours later when interviewed by the SPRU workers and she left a defenseless infant behind with . . . another adult, who was also under the influence of drugs, to care for the child when she fled the premises for an extended period of time.

> The sum of . . . the surrounding circumstances are synergistically related. Even if [Stella]'s conduct was viewed as merely being a slight inadvertence . . . her actions still constitute abuse and neglect. The foreseeable consequences of what she did created the substantial risk of imminent harm by leaving a child to be cared for by another adult who was also intoxicated and under the influence of illicit substances.

> The analysis and results of [Floyd]'s conduct are even more compelling. . . .

7

. . . .

Accordingly, the [c]ourt is more than satisfied from the totality of these circumstances that [Floyd] was under the influence of an illegal and illicit substance, probably heroin, while he was in a caretaking role for [Dylan] on the night of May 17, 2017. He was supposed to be supervising [Stella] . . . , but instead engaged in a significant confrontation wherein both parties ended up being injured resulting in [Stella], who was also readily intoxicated, determined to leave the premises, thereby [leaving Floyd] . . . alone under the influence to care for a [sixteen]-month-old child.

[Floyd] then exacerbated these circumstances once he observed through the window the trooper car pull up to the front of the house. [Floyd] then departs the premises through the back sliding glass door, leaving the door wide open and leaving [Dylan] alone in the house.

. . . .

. . . A responsible caretaking adult simply cannot be under the influence of drugs, and then leave the residence leaving a [sixteen]-month-old behind. Even if the child is asleep in a secure crib, an individual under those circumstances, which are the circumstances [Floyd] created, exposes the child to imminent danger and a substantial risk of harm.

Although Flynn was not present during the incident, the judge concluded the parties' conduct posed a risk of harm to both children.

8

The judge signed the May 18, 2018 order memorializing his determination. These appeals followed.

In A-4903-17 Stella raises the following point:

> POINT I - THE TRIAL COURT ERRED IN FINDING THAT [STELLA] ABUSED AND NEGLECTED [FLYNN] and [DYLAN].
>
>         . . . .
>
> > B. There Was No Adequate, Substantial, Credible Evidence That [Floyd]'s Assault Upon [Stella] Exposed The Children To An Imminent Risk of Substantial Harm.
> >
> > C. There Was No Adequate, Substantial, Credible Evidence That [Stella] Was Under The Influence While In A Caretaking Role Or If Her Alleged Alcohol Consumption Exposed The Children To An Imminent Risk Of Substantial Harm.
> >
> > D. There Was No Adequate, Substantial, Credible Evidence That [Stella] Inadequately Supervised The Children Thereby Exposing Them To An Imminent Risk Of Substantial Harm.

In A-4904-17, Floyd the following points:

> POINT I - THE DETERMINATION THAT [FLOYD] VIOLATED N.J.S.A. 9:6-8.21(c) WAS NOT BASED ON EVIDENCE TO SUPPORT A CONCLUSION THAT HE FAILED TO MEET A MINIMUM DEGREE OF CARE AND PLACED THE BOYS AT SUBSTANTIAL RISK OF IMMINENT DANGER

9

WHERE DCPP PRESENTED NO EVIDENCE THAT [DYLAN] WAS NOT SAFE AND WHERE [FLYNN] WAS NOT HOME.

A. THE COURT ERRED IN CONCLUDING THAT [FLOYD]'S BEING LESS THAN TWENTY FEET AWAY FROM THE HOUSE AND ALLEGED TO HAVE USED SUBSTANCES AT SOME UNKNOWN TIME FAILED TO PROVIDE LESS THAN "SCANT CARE" OR DISREGARDED A PERILOUS SITUATION TO CONSTITUTE GROSS NEGLIGENCE REQUIRED FOR TITLE 9 LIABILITY.

1. Failure to meet the minimum standard of care requires evidence of gross negligence, defined as less than "scant" or "slight" care that is "likely to, or probably will" result in injury, here absent.

2. Not only must there be evidence of gross negligence to violate Title 9, absent actual injury, the record must establish "substantial risk" of "imminent" harm, which is not shown by a mere potential for harm or an "anything could have happened" analysis.

3. Suspected ingestion of substances, without more, does not abrogate the Family Part's responsibility to evaluate whether a child was placed at a substantial risk of imminent harm that a parent created or should have known was likely to result.

10

POINT II - REVERSAL OF THE CONCLUSION THAT [FLOYD] VIOLATED N.J.S.A. 8:6-8.21(c)(4) AS TO [FLYNN] IS REQUIRED AS A MATTER OF LAW.

I.

"[W]e generally defer to the factual findings of the trial court because it has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. R.D., 207 N.J. 88, 112 (2011) (quoting N.J. Div. of Youth & Family Servs. v. G.M., 198 N.J. 382, 396 (2009)). "Because of the Family Part's special jurisdiction and expertise in family matters, we accord particular deference to a Family Part judge's fact-finding." N.J. Div. of Youth & Family Servs. v. T.M., 399 N.J. Super. 453, 463 (App. Div. 2008) (citing Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

We must examine "whether there was sufficient credible evidence to support the trial court's findings." N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 342 (2010). "We will not overturn a family court's factfindings unless they are so 'wide of the mark' that our intervention is necessary to correct an injustice." N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448

11

(2012) (quoting <u>N.J. Div. of Youth & Family Servs. v. E.P.</u>, 196 N.J. 88, 104 (2008)).

## II.

The purpose of a fact-finding hearing is "to determine whether the child is . . . abused or neglected[.]" N.J.S.A. 9:6-8.44. An "[a]bused or neglected child" includes a minor child:

> whose physical, mental, or emotional condition has been impaired <u>or is in imminent danger of becoming impaired</u> as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, <u>or substantial risk thereof</u>, . . . or by any other acts of a similarly serious nature requiring the aid of the court[.]
>
> [N.J.S.A. 9:6-8.21(c)(4) (emphasis added).]

"Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." <u>In re Guardianship of DMH</u>, 161 N.J. 365, 383 (1999) (citing <u>N.J. Div. of Youth & Family Servs. v. A.W.</u>, 103 N.J. 591, 616 n.14 (1986)). "[W]hen there is no evidence of actual harm, the focus shifts to whether there is a threat of harm." <u>N.J. Div. of Child Prot. & Permanency v. E.D.-O.</u>, 223 N.J. 166, 178 (2015). "[T]he standard is not whether some potential for harm exists[,]" rather, "[a] parent fails to exercise a minimum

A-4903-17T3

degree of care when she is 'aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to the child.'" Id. at 183-84 (quoting N.J. Dep't of Youth & Family Servs. v. J.L., 410 N.J. Super. 159, 168-69 (App. Div. 2009)). "[A] finding of abuse and neglect can be based on proof of imminent danger and a substantial risk of harm." Id. at 178 (citation omitted).

"Whether the parent has exercised the requisite degree of care is to be analyzed in light of the dangers and risks associated with the particular situation at issue." J.L., 410 N.J. Super. at 168 (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)). The trial judge must consider "the totality of the circumstances, since '[i]n child abuse and neglect cases the elements of proof are synergistically related. Each proven act of neglect has some effect on the [child]. One act may be "substantial" or the sum of many acts may be "substantial."'" N.J. Div. of Youth & Family Servs. v. V.T., 423 N.J. Super. 320, 329-30 (App. Div. 2011) (alterations in original) (quoting N.J. Div. of Youth & Family Servs. v. C.H., 414 N.J. Super. 472, 481 (App. Div. 2010)).

We have repeatedly "reiterated the societal concern that no child come under the care of an intoxicated parent." N.J. Div. of Child Prot. & Permanency v. R.W., 438 N.J. Super. 462, 469 (App. Div. 2014) (citing V.T., 423 N.J. Super.

at 331). However, "not all instances of drug ingestion by a parent will serve to substantiate a finding of abuse or neglect." V.T., 423 N.J. Super. at 332.

We have stated "parental inaction in addressing past conditions pos[es] a danger to a child [and] is a circumstance pertinent to a finding of abuse or neglect" when a drug-abusing parent is involved. N.J. Div. of Child Prot. & Permanency v. M.C., 435 N.J. Super. 405, 419 (App. Div. 2014), abrogated on other grounds by E.D.-O., 223 N.J. at 189. See N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 281-83 (2007) (finding abuse or neglect where the father refused to provide care to his child separate from the child's mother who posed a serious risk to the child due to her substance abuse problems); see also N.J. Div. of Youth & Family Servs. v. A.R., 405 N.J. Super. 418, 425-26, 435-36 (App. Div. 2009) (finding abuse or neglect based on the violation of an order prohibiting the father from the home while known to have been actively using drugs).

Having considered the parties' arguments in light of the aforementioned standards, we affirm for the reasons expressed in the trial judge's decision. The totality of the circumstances did indeed demonstrate that both parties were intoxicated during their altercation, which—given their history of substantiations for neglect—posed an unacceptable imminent risk of a

14

substantial harm to the children. Finally, that Flynn was not present for the incident is irrelevant as proof of abuse or neglect regarding one child is admissible as evidence of the abuse or neglect of another as a matter of law. N.J.S.A. 9:6-8.46(a)(1); N.J. Div. of Youth & Family Servs. v. Robert M., 347 N.J. Super. 44, 68 (App. Div. 2002).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION