# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3194-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.B.,

      Defendant-Appellant/
      Cross-Respondent,

and

K.M., L.J., and D.T.,

      Defendants,

_____

IN THE MATTER OF L.J.
and L.M.,

      Minors/Cross-Appellants.

_____

Argued September 13, 2021 – Decided October 7, 2021

Before Judges Sumners and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0275-19.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant/cross-respondent M.B. (Joseph E. Krakora, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

Nicholas Dolinsky, Deputy Attorney General, argued the cause for respondent (Andrew J. Bruck, Acting Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Nicholas Dolinsky, on the brief).

Cory H. Cassar, Designated Counsel, argued the cause for minor/cross-appellant L.J. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, of counsel and on the brief).

Cory H. Cassar, Designated Counsel, argued the cause for minor/cross-appellant L.M. (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Dana Citron, Designated Counsel, on the brief).

PER CURIAM

Following a fact-finding hearing, the Family Part entered an order finding defendant M.B. (Mary)[1] abused or neglected her autistic and non-verbal three-

---

[1] We use initials and pseudonyms to protect the confidentiality of the participants in these proceedings. R. 1:38-3(d)(12).

year-old daughter, L.M. (Leda), in accordance with N.J.S.A. 9:6-8.21(c)(4)(a) and (b). The trial court found Mary did not provide a minimum degree of care as she was grossly negligent in inadequately supervising Leda and placing her at significant risk of harm because she: (1) left her sixteen-year-old son L.J. (Lonny) and her apartment mate D.T. (Dan) to care for Leda for five hours at night, resulting in injuries to Leda; and (2) did not provide Leda with adequate medical treatment for her injuries. Mary appeals; and Leda and Lonny, through the Law Guardian, cross-appeal, each arguing that Mary provided a minimum degree of care in providing adequate supervision and medical treatment for Leda. After considering the contentions advanced on appeal and the applicable legal standards, we reverse.

I

Following an investigation regarding possible abuse or neglect of Leda and Lonny, on April 9, 2019, DCPP filed a verified complaint for custody, care, and supervision of Leda and Lonny.[2] The subsequent August 6 fact-finding hearing revealed the following relevant facts.

---

[2] On April 9, 2019, Leda was placed in the physical custody of her father K.M. She was returned to Mary's custody on November 4. Lonny remained in Mary's physical custody throughout the litigation.

On Monday, April 1, 2019, at approximately 8:00 p.m., Mary asked Lonny to watch Leda while Mary drove from their Newark apartment to New York City to check on her mother. Mary's mother had called her asking her to come over–her brother was already there–because "some issues were going on" at her mother's house. Before leaving, Mary "washed [Leda] up, . . . fed her, . . . put her to bed" because she wanted to follow Leda's regular nighttime schedule. Leda was sleeping in Mary's bed because her toddler's bed was "disassembled in anticipation of the[ir] move."

Lonny had watched Leda before, but it was never for more than thirty minutes. Mary stated Lonny was: "very responsible. He's a really good kid. He's not out in the street, he's into his school work [and] football. He's a homebody." She further noted that since her other daughter went to college, Lonny and Leda became closer. At some point that evening, Lonny asked Dan to keep an eye on his sister because he had school the next day and had to go to bed.

At the time, Dan was living at the apartment with Mary and her children. Mary had known Dan for about two months and allowed him to move into her apartment with her children because he was having a "rough time." Because she was moving out of her apartment, she agreed to allow Dan and his brother "take

A-3194-19

over the apartment" so Dan "wouldn't be in the street."  Mary acknowledged that "[a]t first, . . . [she] was a little skeptical but then as time [went] by, [Dan] didn't really seem like a person that would do anything . . . ." and she "trusted him."  She was pleased with the way he interacted with her children and, particularly, in helping with Leda.  The record is unclear how long Dan had been living with Mary and her children before April 1.  He was paying Mary rent.

Mary returned home five hours later the next morning on April 2, around 1:00 a.m., claiming she was delayed due to heavy traffic leaving New York.  Just as she arrived home, she got separate phone calls from Dan and Lonny informing her that Leda had been injured.  When Mary got in the house, she saw blood around Leda's mouth, which was "a little swollen."  After wiping the blood off Leda's face, Mary "made sure that her teeth and nothing [were] broken or anything" and held "and rock[ed] her, just making sure that she was okay."[3] Leda eventually fell asleep in her arms.

Mary believed Leda's injuries were not serious enough to take her to the hospital emergency room or her pediatrician for medical attention.  She testified:

> I didn't know the seriousness of the injuries and I just thought that maybe I could . . . do stuff myself to self-medicate because that's what mothers always do.

---

[3] According the Division's investigator, Mary also put a cold compress on Leda's face.

> If your kid fall[s] and hurt[s] her knee or something, . . .
> you try to adjust things at home before you really take
> [her] to the hospital.

Leda showed no signs that she had any broken bones because, according to Mary, she "didn't cry" or indicate something was wrong when she was picked up.

Dan explained—without much detail—to Mary that Leda fell off the bed while sleeping. Lonny told her that he was in his room when Dan banged on his door to tell him that Leda fell off the bed. Mary believed Leda fell of the bed because "she sleeps kind of wild." Although she was not sure, Mary also believed Leda's facial bruises and cuts could have been caused if "she hit the floor hard" or scraped her face on something.

That morning, Leda's face was swollen, so Mary decided to keep her out of school. In fact, she texted Leda's teacher a picture of Leda's injuries. Even though her employer did not allow it, Mary took Leda with her to her job as a school bus aide. Upon noticing that Leda was not "really herself," Mary called her pediatrician to make an appointment the next afternoon, "to make sure she's okay." She had to wait until the late afternoon to call because that is when the office opened.

6

The next day, April 3, before going on her three-hour afternoon bus aide shift and then taking Leda to the doctor's appointment, Mary accepted Dan's offer to watch Leda, who was napping at home. Lonny was in school at the time. When Mary got home to take Leda to her doctor, Leda was laying in the same spot. After getting her ready and placing her in the car, Mary noticed the top of Leda's hand was burned. She went back in the apartment to ask Dan about the burn. Dan claimed Leda burned her hand on the ravioli that Mary had asked him to heat up and feed Leda. Mary asserted that she told him to heat up the pasta for thirty seconds, but Dan told her he heated it up for three minutes, "sat it on the bed and . . . went to the bathroom and [heard Leda] . . . crying." Mary doubted Dan's version of how the incident occurred. Mary maintained that even though Leda was autistic, she would pull back from touching something that was hot. Moreover, she could not understand how the back of Leda's hand got burned. Yet, according to the hospital's child abuse pediatrician, "[t]he pattern of the burns on [Leda]'s hand could be consistent with" the claim that they "were caused by hot ravioli accidentally contact[ing] [Leda']s hand."

After examining Leda, her pediatrician advised Mary to take Leda to the hospital, cautioning her that the staff there would probably contact DCPP to

7

report that Leda was possibly abused or neglected. Mary complied, and testified she was not concerned about DCPP because she simply wanted Leda to get help.

Initial x-rays and CAT scan at the hospital were negative, but it was later determined that Leda had a non-displaced fracture of her right humerus caused by a direct impact or a twisting force. Hospital records also noted Leda had facial swelling, multiple facial and ear lacerations, facial bruising, left foot bruises/abrasions, multiple hyperpigmented scars on her lower extremities, subconjunctival hemorrhage of the right eye, lip abrasion, and first- and second-degree hand burns on her the top of her right hand. Leda was admitted to the hospital's pediatric ICU for care and was released seven days later.

According to DCPP's caseworker's interview report, Mary "said that she did not seek medical attention for [Leda] at that time [she allegedly fell off of the bed] because she was afraid DCPP would take her," because DCPP "blows things out of proportion." While she vehemently denied the statement, Mary admitted that upon reflection she should have taken Leda "right away, even if it was to the [e]mergency [r]oom or to the pediatrician but" did not. Due to Leda's injuries, Mary regretted going to check on her mother in New York.

At the conclusion of a one-day fact-finding hearing, the trial court entered an order finding by a preponderance of the evidence that Mary abused and

neglected Leda in accordance with N.J.S.A. 9:6-8.21(c)(4)(a) and (b). In its oral opinion, the court noted that Mary's testimony was credible, but found her guilty of abuse and neglect because she

> . . . left her three[-]year old non-verbal autistic child in the care of her [sixteen-year-old] son, [Lonny], and a male friend, [Dan], who she had known for only several weeks, on one occasion. And when [Leda] received injuries extensively from falling off the bed, she then leaves the child alone with [Dan] again while she is at work and the child receives additional injuries in the form of first[-] and second[-]degree burns.
>    By leaving her special needs child with [Dan], [Mary] did not exercise a minimum degree of care and was grossly negligent by leaving her inadequately supervised and placing her at significant risk of harm.

The court also found Mary was guilty of medical neglect in that "[she] acknowledged that she did not seek medical attention for [Leda] because she was concerned that [Leda] would be removed from her care." The court reasoned that Mary delayed medical treatment until Leda's "condition worsened two days later," concluding that Mary "herself acknowledged that she should have acted quicker." Additionally, the court determined that if Mary had taken

Leda to the emergency room on the early morning of April 2, Leda would not have been burned on April 3.[4]

II

"Abuse and neglect cases 'are fact-sensitive.'" Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180 (2015) (quoting Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011)). To prevail in a Title Nine proceeding, DCPP must show by a preponderance of the competent, material, and relevant evidence that the parent or guardian abused or neglected the affected child. N.J.S.A. 9:6-8.46(b). There must be "proof of actual harm or, in the absence of actual harm," through "competent evidence adequate to establish the child was presently in imminent danger of being impaired physically, mentally or emotionally." N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 158 (App. Div. 2014) (citation omitted).

---

[4] Three months later, Leda was returned to Mary's care after having been placed in her father's custody after being released from the hospital. The same court determined that Mary had not "caused . . . [Leda's] injuries" and had "learned [her lesson] throughout all of this." Noting that Mary also engaged in therapy and took parenting classes, the court ruled "the safety concerns [she presented] have been remediated." Because there were concerns that Leda had not been going to school under her father's custody, the Title Nine litigation was not dismissed until after the father's visitation was resolved.

A-3194-19

In this case, under its theory of abuse and neglect, DCPP was required to prove that Leda's

> physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of [her] parent or guardian . . . to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so[.]
>
> [N.J.S.A. 9:6-8.21(c)(4).]

The term "'minimum degree of care' refers to conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Human Servs., 157 N.J. 161, 178 (1999) (citing Miller v. Newsweek, 660 F. Supp. 852, 858-59 (D. Del. 1987)). A parent "fails to exercise a minimum degree of care when he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." Id. at 181. When determining whether a child is abused or neglected, the focus is on the harm to the child, and whether that harm should have been prevented had the guardian performed some act to remedy the situation or remove the danger. Id. at 182. "Whether the parent has exercised the requisite degree of care is to be analyzed in light of the dangers and risks associated with the particular situation at issue." N.J. Div. of Youth & Family Servs. v. J.L., 410

11

N.J. Super. 159, 168 (App. Div. 2009) (citing G.S. v. Dep't of Human Servs., 157 N.J. 161, 181-82 (1999)). "[W]here a parent is merely negligent there is no warrant to infer that the child will be at future risk." T.B., 207 N.J. at 307.

We give considerable deference to the family court's factual determinations because it has "the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand . . . [and] a 'feel of the case' that can never be realized by a review of the cold record." N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 293 (2007)). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." Ibid. (quoting N.J. Div. of Youth & Family Servs. v. G.L., 191 N.J. 596, 605 (2007)).

A. Supervision of Leda

Mindful of our deferential standard to the Family Part, we are constrained to conclude the record does not support its finding that the DCPP proved Mary's decision to leave Leda under the care of her sixteen-year-old son for five hours on the evening of April 1 through the early morning of April 2, while Leda was sleeping and Dan was staying at their home, was below the minimum degree of

12

care and "grossly negligent" under Title Nine. Despite Mary's acknowledgement in hindsight that she regretted leaving Leda to help her mother, this reflection does not evince that she was grossly negligent. Any caring and responsible parent who leaves a child to someone else's care would have regrets or remorse if misfortune befalls the child during his or her absence. Yet, that does not mean Mary failed to provide a minimum degree of care and was grossly negligent or acted recklessly in creating a risk of serious injury to Leda.

We agree with Mary and the Law Guardian that there was no reason to think that there was a risk of harm to Leda by leaving her under Lonny's care while she was sleeping. Mary's absence was not for a trivial reason; she made an emergent visit to her mother in New York City. Mary's testimony that Lonny was a responsible teenager who had previously cared for his sister without incident–albeit for a much shorter time–was uncontroverted. Likewise, there was no cause to be concerned that Dan's presence would place Leda at a risk of harm. In fact, it was Lonny who asked Dan to keep an eye on his sister when his mother was delayed in getting home because he had school the next day and needed to go to sleep. There was nothing in the record to suggest that Mary had

13

reason to believe her emergent trip to New York City on a Sunday night would be longer than expected due to a traffic delay.

Mary's situation was somewhat akin to the defendant in T.B. There, the Supreme Court held the defendant was merely negligent in assuming that her mother was home to watch her four-year-old child because she saw her mother's car in the driveway when she put the child to bed and left the house to have dinner with a friend. T.B., 207 N.J. at 297, 309. In actuality, the defendant's mother was not there, and the child woke up and wandered outside unharmed. Id. at 297. The Court concluded the defendant, who lived with her parents, left her child sleeping in the safe confines of a bed with good cause to believe that her mother was there to watch her based upon the established routine between the defendant and her mother. Id. 309-10. Accordingly, it was held that there was no abuse or neglect; defendant's conduct was negligent but did not rise to the level of gross negligence or recklessness that would constitute a failure to "exercise a minimum degree of care." Id. at 310.

Like the defendant in T.B., we conclude Mary had good cause to believe Lonny, who was responsible, could watch a sleeping Leda while she travelled to New York to check on her mother. In addition, as noted, she had no reason to believe she would be away from Leda for five hours. Under the facts known

14

to Mary when she left Leda in her teenage son's care, we cannot conclude she knowingly exposed Leda to significant danger. The trial court seems to focus on the fact that Mary barely knew Dan. However, she did not ask Dan to watch Leda. Lonny asked Dan to take over watching Leda, which Mary could not have reasonably expected. Moreover, there was no reason for Mary to believe that Leda would be in any type of danger with Dan in the home.

We also disagree with the trial court that Mary was grossly negligent in leaving Leda with Dan on the afternoon of April 3–after she had fallen off the bed sometime in the late evening on April 1, or early morning on April 2, while under Lonny and Dan's watch–when Leda suffered first- and second-degree burns on the top of her right hand. Hindsight is always twenty/twenty – had Mary not worked her afternoon shift or had she awakened Leda to take her on the shift, Leda would not have been burned. However, there were no facts suggesting that Dan's mistreatment or carelessness caused Leda's injuries due to her fall from the bed. Mary believed it was plausible for her to fall off the bed as Dan claimed because of Leda's sleeping manner. There was no reason for Mary to believe that Dan could not be trusted to watch Leda while she napped and then heat up the ravioli and feed her after she woke up. Arguably, one might conclude Mary was negligent to allow Dan to watch Leda on the heels of what

15

happened to Leda less than two days earlier, but the facts do not support the court's determination that Mary was grossly negligent or acted recklessly in accepting Dan's offer to watch her daughter so she could go to work.

B. Medical Neglect

The trial court determined DCPP established there was a substantial risk of harm to Leda when Mary did not get her prompt medical attention until the afternoon of April 3. We disagree.

Courts "at the trial and appellate level cannot fill in missing information on their own or take judicial notice of harm." N.J. Dept. of Children and Families, Div. of Youth and Family Servs. v. A.L., 213 N.J. 1, 28 (2013) (internal citation omitted). In A.L., the evidence showed that the defendant mother used cocaine during her pregnancy and the child had cocaine metabolites in his meconium. Id. at 27. The Court, however, reversed the finding of abuse or neglect based on the mother's prenatal drug use. Id. at 34. The Court determined that although the evidence established the defendant used cocaine during her pregnancy, the Division[5] failed to "establish proof of imminent

_____

[5] "Division" refers to the New Jersey Division of Youth and Family Services, the agency's name prior to the reorganization of the Department of Children and Families and its renaming as the Division of Child Protection and Permanency. L. 2012, c. 16, eff. June 29, 2012.

danger or substantial risk of harm" because it failed to present evidence showing "the degree of future harm posed to the child." Id. at 27-28. The Court noted that where "the evidence presented does not demonstrate actual or imminent harm, expert testimony may be helpful." Id. at 28.

Similarly, in N.J. Div. of Youth & Family Servs. v. S.I., 437 N.J. Super. 142, 146 (App. Div. 2014), we considered a trial court's determination that the failure of a guardian to follow a Division recommendation to obtain a mental health evaluation following a child's threat to commit suicide constituted abuse or neglect. We reversed the finding because the Division failed to present any evidence "demonstrat[ing] the child's physical, mental, or emotional condition was impaired or that she was in imminent danger of harming herself as a result of [the defendant's] decision to decline the recommendation for an immediate evaluation." Id. at 157.

We further noted the "need for evidence to support a claim of abuse or neglect," including "proof of actual harm or, in the absence of actual harm, 'the Division was obligated to present competent evidence adequate to establish [the child was] presently in imminent danger of being impaired physically, mentally or emotionally.'" Id. at 158 (alteration in original) (quoting N.J. Div. of Child Prot. & Permanency v. M.C., 435 N.J. Super. 405, 409 (App. Div. 2014)). The

17

DCPP's "essential proofs cannot merely be based on the Division's view that the parent or guardian's decision was ill-advised." Ibid. The DCPP must establish the child suffered actual "harm or show the likelihood of an imminent substantial risk of harm rising above mere negligence." Ibid.

Guided by these standards, we are convinced the court erred by finding DCPP satisfied its burden. The record is devoid of any evidence showing that Mary's delay in seeking medical attention caused Leda actual harm or that there was a likelihood of imminent risk of harm due to the delay. DCPP failed to introduce any evidence showing that due to the nature and extent of Leda's injuries, Mary's delay in obtaining medical attention resulted in any actual harm or created an imminent risk of substantial harm to Leda. Moreover, DCPP did not refute Mary's testimony that she had no reason to think that Leda's arm was fractured. It is not uncommon for a person to realize a bone is broken until days after the injury.

Because the record is devoid of any evidence supporting the trial court's finding that in "delaying medical treatment for Leda, [Mary] was grossly negligent and put her at significant risk of harm," we cannot bridge the gaps in DCPP's proofs and assume harm where the agency did not present any evidence demonstrating harm. See A.L., 213 N.J. at 28. Even if we agree with the court's

finding that Mary chose not to take Leda to the doctor earlier or to the emergency room out of fear that DCPP would be contacted, there was still no evidence showing actual harm or an imminent risk of harm to Leda by the delay. We thus reverse the court's determination that Mary abused or neglected Leda by not seeking medical treatment for the child's injuries prior to taking her to the doctor on April 3.[6]

Because we do not conclude Mary was grossly negligent or put Leda at significant risk by not getting her medically evaluated before the afternoon of April 3, we cannot in turn conclude that her neglect caused her burn injury. The burn injury is independent of the decision to have Leda treated for the injuries she suffered from falling off the bed. Leda's burns were not caused by the delay in receiving medical treatment.

Accordingly, we reverse the trial court's order finding that Mary abused or neglected Leda and direct the court to remove her name from the central registry maintained by DCPP pursuant to N.J.S.A. 9:6-8.11.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[6] Given our ruling, we need not address Mary's contention that the court incorrectly used the hospital records to establish the extent of Leda's injuries, when the DCPP did not offer them "to establish any sort of expert diagnosis."

A-3194-19